# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CLAUDIA M. BRINGE**
           **Plaintiff,**

      **v.**                                 **Case No. 08-C-1025**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff Claudia Bringe seeks judicial review of the denial of her application for supplemental security income ("SSI"). In her SSI application, filed in March 2005, plaintiff alleged disability beginning December 8, 2004 based on a neck and back injury suffered in a car accident, and an irregular heart beat. She stated that she could not sit for more than an hour without having to get up and move around, that she could not stand very long or lift more than a few pounds with her left (dominant arm), and that her medications interfered with concentration and made her drowsy. (Tr. at 70-74.) She subsequently reported left shoulder problems (Tr. at 114), irritable bowel syndrome ("IBS") (Tr. at 126), fibromyalgia, damaged cartilage in the right knee, numbness in the extremities and irregular blood pressure (Tr. at 138).

The Social Security Administration ("SSA") denied the application initially (Tr. at 41; 50) and on reconsideration (Tr. at 40; 44). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. at 13; 42), but he too determined that plaintiff was not disabled under SSA guidelines (Tr. at 14-27). The SSA's Appeals Council denied plaintiff's request for review

(Tr. at 4), making the ALJ's decision the SSA's final word on plaintiff's application. See <u>Nelms v. Astrue</u>, 553 F.3d 1093, 1097 (7th Cir. 2009).

## I. ENTITLEMENT TO SSI

Under SSA regulations, entitlement to SSI is determined pursuant to a sequential, five-step process. At the first step, the ALJ determines whether the claimant has, since the alleged onset of disability, engaged in substantial gainful activity. If not, the ALJ proceeds to step two and determines whether the claimant has a severe, medically determinable physical or mental impairment, i.e. one that significantly limits her physical or mental ability to perform basic work activities. If so, the ALJ decides at step three whether any of the claimant's impairments meets or equals one of the conclusively disabling impairments listed in SSA regulations. If not, the ALJ determines at step four whether the claimant possesses the residual functional capacity ("RFC") to perform her past relevant work. If not, the ALJ proceeds to the final step, determining whether, in light of her RFC, age, education and work experience, the claimant can make the adjustment to other work. 20 C.F.R. § 416.920(a)(4).

The claimant carries the burden at steps one through four of this process, but if she reaches step five the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. <u>Zurawski v. Halter</u>, 245 F.3d 881, 886 (7th Cir. 2001). The SSA may carry this burden by either relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of her limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid to deny a claim if the claimant's attributes do not correspond precisely to a particular rule, or if non-exertional

2

limitations (e.g., pain, manipulative limitations, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work. In such a case, the ALJ must solicit the testimony of a VE, although he may use the Grid as a "framework" for making a decision. Patterson v. Barnhart, 428 F. Supp. 2d 869, 872 (E.D. Wis. 2006).

## II. JUDICIAL REVIEW

A court reviewing the denial of SSI benefits must determine whether the ALJ's decision is supported by "substantial evidence" and free of harmful legal error. Nelms, 553 F.3d at 1097. Evidence is "substantial" if it is sufficient for a reasonable mind to accept as adequate to support the decision. Ketelboeter v. Astrue, 550 F.3d 620, 624 (7th Cir. 2008). Accordingly, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must stand. Lee v. Sullivan, 988 F.2d 789, 793-94 (7th Cir. 1993). The court may not re-weigh the evidence, resolve evidentiary conflicts, decide questions of credibility, or substitute its judgment for the ALJ's. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).

But this does not mean that the court acts as an "uncritical rubber stamp." Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984). The court must review the entire record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision. Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005). Further, the court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the reasons given by the ALJ do not provide an accurate and logical bridge between the evidence and the result. Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (citing Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)). Similarly, if the ALJ commits an error of law, reversal may be "required without regard to the

3

volume of evidence in support of the factual findings." <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ may commit reversible, legal error if he fails to comply with the SSA's regulations and rulings for evaluating disability claims. <u>See, e.g.</u>, <u>Giles ex rel. Giles v. Astrue</u>, 483 F.3d 483, 488 (7th Cir. 2007); <u>Golembiewski v. Barnhart</u>, 382 F.3d 721, 724 (7th Cir. 2004).

### III. FACTS AND BACKGROUND

**A.    Medical Evidence**

    **1.    Treating Providers**

As indicated, plaintiff alleged disability following a car accident on December 8, 2004.[1] Plaintiff went to the emergency room the day after the accident, complaining of neck and low back pain, and ankle pain. (Tr. at 190; 203-04.) X-rays of the cervical spine revealed no fractures, a head CT was likewise normal (Tr. at 190; 195; 196), and plaintiff received conservative treatment from her chiropractor, Dr. Kenneth Koch (Tr. at 197-202; 210-15; 227-37), and her primary physician, Dr. Michael Dawson (Tr. at 190; 203-04). An MRI completed on December 14, 2004, revealed a small disc protrusion at C6-7, with suspected impingement on the left C7 nerve root, and mild to moderate degenerative spondylosis of the lower cervical spine. (Tr. at 181-182; 193.) X-rays of the right ankle taken the same day were negative. (Tr. at 180; 202.)

─────────────────────

[1]The medical records received by the ALJ indicate that plaintiff obtained treatment related to her complaints of chest pain, palpitations, shortness of breath, dizziness and syncope (i.e., fainting) prior to the car accident. Testing completed between April and July 2004 was essentially normal (Tr. at 247; 250-55; 313-16), and Dr. Salim Shammo concluded that from a cardiac standpoint she was stable (Tr. at 243), suggesting consideration of non-cardiac causes of her chest pain (Tr. at 251). Likewise, physicians at the St. Luke's emergency department, which plaintiff visited on April 24, 2004 complaining of chest pain, believed her symptoms more related to anxiety and stress reaction. (Tr. at 326.)

4

Plaintiff returned to Dr. Dawson on January 31, 2005, complaining of persistent left posterior neck pain and right ankle pain, despite the use of narcotic medication. (Tr. at 381.) On exam, Dr. Dawson noted that muscle strength testing of the left arm was limited by pain, and that plaintiff seemed to have diminished grip strength in the left hand. (Tr. at 382.) Plaintiff saw Dr. Cully White, an orthopedic specialist, on referral from Dr. Dawson on February 9, complaining of neck pain and bilateral arm pain, as well as severe headaches, numbness and pain in the left hand, and low back pain extending down to the knees. (Tr. at 190.) Dr. White recommended an EMG and lumbar MRI, and consideration of a discectomy and fusion at C6-7 if plaintiff did not further improve with conservative treatment. (Tr. at 189.)

An MRI of the lumbar spine completed on February 16 revealed desiccation of the L5-S1 disc, and minimal diffuse posterior disc bulging at L3-4 and L5-S1 with no significant mass effect on the thecal sac or neural foramina. (Tr. at 187-88; 287.) Electro-diagnostic studies completed on March 9 revealed mild acute and chronic left C7, 8 radiculopathy, but no evidence of left median or ulnar neuropathy. (Tr. at 177-78; 206-07.)

Plaintiff returned to Dr. White on March 25, still complaining of pain radiating to both arms, as well as numbness in the third, fourth and fifth fingers of the left hand and left arm weakness. On review of the MRIs, Dr. White concluded that plaintiff had a disc herniation at C6-7, as well as a disc bulge at C5-6, and minimal disc bulges at L5-S1 and L3-4. He recommended conservative treatment for the low back but surgery for the cervical problems. (Tr. at 393-94.)

Plaintiff returned to Dr. Shammo in April of 2005 regarding her cardiac complaints and in anticipation of the surgery with Dr. White. Dr. Shammo assured plaintiff that her heart was stable to undergo any type of surgery she might need (Tr. at 240), and a May 3, 2005,

5

echocardiogram was normal.  (Tr. at 239; 307.)

A repeat cervical MRI completed on May 18 revealed a subtle degree of disc protrusion at the C6-7 level.  (Tr. at 305-06.)  In a May 19 letter to Dr. Dawson, Dr. White reiterated his recommendation for an anterior cervical discectomy and fusion at C6-7, but noted that plaintiff had elected to seek a second opinion.  (Tr. at 392.)

Plaintiff returned to Dr. Dawson on May 19, noting that the pain in her left shoulder and arm had improved considerably, but the weakness in her left hand continued.  Dr. Dawson also noted a history of chronic anxiety and panic attacks, for which plaintiff took medication.  (Tr. at 378.)  Dr. Dawson advised plaintiff to return to physical therapy with her chiropractor until she could be seen for a second opinion in the Neurosurgery Clinic at Froedert Hospital.  He advised that based on the resolution of her radicular pain, there was no need to consider surgery at that time.  He further advised that, based on the normal testing, plaintiff's cardiac symptoms were simply caused by anxiety and de-conditioning.  (Tr. at 279.)[2]

On May 31, plaintiff saw Dr. Shekar Nurpad, a neurosurgeon, for a second opinion about her neck, and he concluded that she was not a surgical candidate but rather would benefit from

_____

[2]Plaintiff underwent further cardiac testing with Dr. Sanjay Deshpande, on referral from Dr. Shammo, in May and June 2005 (Tr. at 349), which was essentially unremarkable, leaving Dr. Deshpande with the impression that plaintiff's symptoms were likely due to "vasovagal mechanisms."  (Tr. at 322.)  Vasovagal syncope refers to a drop in blood pressure, which may cause loss of consciousness or fainting, due to the action of the vagus nerve upon the blood vessels.  See Stedman's Medical Dictionary 1934 (27th ed. 2000); Fleming v. Verizon New York, Inc., 419 F. Supp. 2d 455, 460 (S.D.N.Y. 2005); http://www.mayoclinic.com/health/vasovagal-syncope/ds00806.  He suggested treatment with a beta blocker (Tr. at 322), which relaxes the blood vessels to allow blood to flow through the body more easily.  See Harris v. Clarke, No. 06-C-0230, 2008 WL 4866683, at *10 n.22 (E.D. Wis. Nov. 10, 2008) (citing http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a697042.html).  The doctor noted that plaintiff's symptoms improved with Xanax and worsened with emotional/upsetting situations.  (Tr. at 341.)

a course of physical therapy and pain management. (Tr. at 366.) Plaintiff subsequently engaged in physical therapy at the Medical College of Wisconsin. On August 22, Lisa Wolfe, NP, indicated that plaintiff was involved in therapy for bilateral arm weakness and unable to return to work at the time. (Tr. at 365; 391.) Also on August 22, Dr. Koch indicated that plaintiff remained under his care related to the December 2004 accident. He wrote that she suffered a disc herniation from the accident, creating radiculopathy causing limitation in her ability to engage in most physical exertion. (Tr. at 529.)

Plaintiff returned to Dr. Dawson on September 13, principally related to a sinus infection, but continuing to complain of neck pain and pain radiating down her left arm. She indicated that the pain had improved with chiropractic treatment but returned following physical therapy. (Tr. at 375; see also Tr. at 541-46.) Dr. Dawson referred her to a different physical therapist and continued medications, including Vicodin. (Tr. at 376.)

In a November 1, 2005 letter, Dr. Dawson stated that plaintiff had a C6-7 disc bulge, probably the result of her December 8, 2004 accident. He indicated that two different neurosurgeons concluded that she experienced radiculopathy involving her left arm as a result; one doctor recommended surgery, the other physical therapy, and plaintiff was receiving treatment from a chiropractor. (Tr. at 390; 461.) Dr. Koch also prepared a letter dated November 1, 2005, imposing a lifting limitation of five to ten pounds, with abstinence from certain activities such as vacuuming and excessive lifting around the house. He indicated that these restrictions would remain in place until at least the end of the year. (Tr. at 526.)

Plaintiff returned to Dr. Dawson on January 5, 2006, again primarily for sinus problems, but with continued left arm and back pain secondary to cervical radiculopathy. (Tr. at 456-59.) On February 15, Dr. Koch prepared another report, in which he limited plaintiff to lifting zero

7

to five pounds several times per day, never more; stand/walking zero to two hours in an eight hour day; and sitting at least two hours in an eight hour day. (Tr. at 518.) He noted some loss of strength with the left arm and restricted her from prolonged bending/stooping, with the ability to change positions frequently. He concluded that she could work only three to four hours per day. (Tr. at 519.)

Plaintiff returned to Dr. Dawson for follow-up on March 2, noting that a gas/carbon monoxide leak had been detected in her apartment, which made her and her children ill. She also complained of palpitations occurring at least three times per day. Cardiac testing had been normal, and she found that Xanax helped. (Tr. at 449.) She also reported chronic neck and back pain, for which she was seeing her chiropractor up to three times per week and using medication. (Tr. at 450-51.) Dr. Dawson re-filled her Xanax prescription – with an increased dose – based on her complaints of anxiety, and her prescription for Vicodin for neck and shoulder pain. (Tr. at 452.)

Plaintiff returned for follow-up on the carbon monoxide issue on March 14, continuing to complain of chronic neck and shoulder pain. (Tr. at 441.) Dr. Dawson recommended an MRI of the shoulder (Tr. at 443), which showed tendinitis and bursitis around the shoulder joint (Tr. at 445; 462-63). On April 26, plaintiff presented with a history of chronic anxiety and multiple somatic complaints, but noted that her neck and shoulder finally seemed to be improving. (Tr. at 434.) Dr. Dawson prescribed Celexa for anxiety, along with a continuation of Xanax. (Tr. at 435.) On July 6, Dr. Dawson recommended that plaintiff see an orthopedic specialist regarding her shoulder (Tr. at 438), and on August 16, he wrote that plaintiff should be excused from work pending evaluation by the orthopedist (Tr. at 436).

Plaintiff saw Drs. Joseph McCormick and Steven Grindel at the Froedert Department

8

of Orthopedic Surgery on August 29, 2006, complaining of bilateral shoulder pain, left greater than right.  The note indicated that her current restrictions were lifting no greater than five pounds, no continuous bending or stooping, and no sitting or standing for long periods of time.  (Tr. at 477.)  Dr. McCormick indicated that the April 2006 MRI revealed tendinosis of the supraspinatus tendon, and his impression was left rotator cuff tendinosis.  He provided a steroid injection to the area and an order for physical therapy.  (Tr. at 478.)  Plaintiff called Dr. Grindel's office the following day, complaining of shoulder swelling, wheezing and dizziness.  She was advised to go to the emergency room for evaluation of a possible reaction to the cortisone injection.  (Tr. at 475.)

When plaintiff returned to Dr. Dawson on September 14, her main problem was chronic anxiety, in addition to chronic neck, back and shoulder pain, for which she took Vicodin and saw her chiropractor.  (Tr. at 430.)  Dr. Dawson ordered various tests based plaintiff's livedo reticularis,[3] peripheral edema and hypoxemia.[4]  (Tr. at 431.)  On October 13, plaintiff saw Dr. Dawson complaining of congestion, sinus pain and a cough, and the doctor diagnosed allergic rhinitis and acute sinusitis.  (Tr. at 428-29.)

On December 8, plaintiff saw Dr. Dawson complaining of umbilical drainage, abdominal pain and bloating, and irritable bowels.  (Tr. at 425-26.)  A CT scan revealed an umbilical hernia, and Dr. Dawson prescribed medication and warm compresses before referring plaintiff to a surgeon.  (Tr. at 423-24.)

---

[3]Purplish discoloration of the skin caused by dilation of capillaries.  Stedman's Medical Dictionary 1025 (27th ed. 2000).

[4]Subnormal oxygenation of arterial blood.  Stedman's Medical Dictionary 867 (27th ed. 2000).

9

Plaintiff returned to Dr. Deshpande in February 2007 for pre-operative clearance related to her hernia surgery. She indicated that since her last visit she continued to have "episodes," including extreme fatigue, chest pain, pulsating in her neck, feet numbness and groin pain, as well as incidents where she became cool and clammy and her heart started racing. She reported that these episodes could occur at any time and had no definite trigger. (Tr. at 470.) Dr. Deshpande cleared her for surgery and suspected that her other symptoms were due to "VVS."[5] (Tr. at 472.)

Plaintiff saw the hernia surgeon, Dr. John Kispert, on February 15, 2007, and he recommended an umbilical hernia repair. (Tr. at 482.) Dr. Kispert performed the surgery, which resulted in improvement of her GI symptoms. (Tr. at 480-81.)

On March 21, plaintiff was admitted to St. Luke's Hospital complaining of chest pain and palpitations. Testing was essentially normal, and she was discharged home in stable condition, with recommendations that she avoid caffeine and follow-up with Dr. Shammo. (Tr. at 485-95.) Plaintiff saw Dr. Shammo on March 27, and he noted a significant weight gain in recent months, about twenty-five pounds. Dr. Shammo suspected underlying sleep apnea and suggested a sleep study, as well as weight loss. (Tr. at 483.)

Plaintiff next saw Dr. Dawson on May 3 for follow-up of her back pain, refill of narcotic pain medication and evaluation of bilateral breast pain. Plaintiff indicated that Vicodin afforded significant pain relief, and that she continued to regularly see her chiropractor. (Tr. at 419.) However, she complained of pain recurring in the area of her hernia repair. (Tr. at 420.) Dr. Dawson diagnosed chronic anxiety and chronic back pain and refilled medications related to

---

[5]I assume the acronym stands for vasovagal syncope.

both. (Tr. at 421.) He also ordered various lab tests, which came back normal. He recommended that plaintiff consider referral to a pain management program, as long-term narcotic use was not the best solution to her problems. (Tr. at 418.)

On June 6, 2007, Dr. Koch prepared a letter indicating that plaintiff had recuperated from a cervical herniated disc but should not do any excessive, heavy lifting due to the possibility of re-injuring the area. She was to return on an as-needed basis. (Tr. at 511.)[6]

On August 21, 2007, plaintiff saw Dr. Henry Rosler at the Pain Management Center of Wisconsin, complaining primarily of low back pain radiating into both legs, which she attributed to a recent injury lifting a box. (Tr. at 536.) On exam, Dr. Rosler noted limited range of motion of the trunk, as well as fifteen out of eighteen tender spots indicative of fibromyalgia. He diagnosed fibromyalgia and lumbosacral strain, suggested water aerobic exercise, and prescribed Neurontin and provided trigger point injections to the low back. (Tr. at 537-38.)

Plaintiff returned to Dr. Rosler on August 27, complaining of pain in multiple areas and stating that Neurontin was of no help. X-rays revealed slight narrowing of the disc space between L5 and S1 but were otherwise normal. (Tr. at 534; 539.) Dr. Rosler referred plaintiff for an MRI, and provided samples of Lyrica and further trigger point injections. (Tr. at 534-35.)

On August 29, 2007, plaintiff returned to Dr. Dawson complaining of severe low back pain, radiating to both legs, which began about one month previously after she lifted a heavy box. She further indicated that Dr. Rosler's trigger point injections had provided no pain relief. She had been taking Vicodin for her neck pain since the motor vehicle accident three years earlier, but found that the medication did not relieve her low back pain. (Tr. at 412.) Dr.

_____

[6]Dr. Koch's notes indicate that he continued to see plaintiff about twice per month through January 2008. (Tr. at 507-10; 512.)

11

Dawson noted tenderness to palpation and that straight leg raising caused posterior thigh and right calf pain. (Tr. at 413.) Dr. Dawson diagnosed back pain/sciatica, chronic anxiety, irritable bowel syndrome and asthma, and provided an injection of Toradol, which seemed to help. He declined to re-fill narcotic pain medication pending the results of the MRI ordered by the pain clinic. Dr. Dawson did refill Xanax, as he believed plaintiff's anxiety provided significant overlay with her underlying physical problems and led to their exacerbation. He also noted that her current symptoms did not fit fibromyalgia very well. (Tr. at 414.) The MRI, completed on August 31, revealed a small to moderate sized L5-S1 extruded disc. (Tr. at 540.)

Plaintiff returned to Dr. Dawson on November 6, primarily complaining of right side abdominal pain. She also had chronic back pain, and Dr. Dawson noted that the recent MRI had revealed a herniated L5-S1 disc on the left, which caused intermittent left foot pain and numbness. Plaintiff also complained of right lateral thigh numbness. She reported using two Vicodin tablets four times per day. She had tried other medications, including anti-depressants, with intolerable side effects. She continued to take Alprazolam for anxiety, as well as medication for irritable bowel syndrome as needed. (Tr. at 405.) Dr. Dawson diagnosed fibromyalgia, chronic back pain, left leg sciatica and meralgia parasthetica (Tr. at 406) and continued her current pain medications (Tr. at 407).

On November 8, Dr. Dawson wrote to plaintiff, indicating that her recent lab work was completely normal. He further advised her to decrease her dose of narcotic pain medication, indicating that treatment of fibromyalgia was better accomplished with medication such as Prozac or Lyrica. (Tr. at 409.)

Plaintiff next saw Dr. Dawson on January 22, 2008, after falling on the ice, resulting in a right knee injury and increased back pain, not relieved by Vicodin. (Tr. at 402.) Dr. Dawson

12

noted that plaintiff was disabled because of her chronic pain. (Tr. at 403.) He advised her to obtain an MRI of her right knee, continue her current medications and apply heat to the affected area. (Tr. at 404.) On January 24, Dr. Dawson wrote to plaintiff, indicating that the MRI revealed a condition called chondromalacia, i.e. wear of the cartilage under the knee cap. (Tr. at 401.) On January 31, Dr. Dawson indicated that based on her knee injury plaintiff should be excused from her volunteer work until February 28, 2008. (Tr. at 400.)

On February 12, plaintiff saw Dr. Timothy Schultz for an orthopedic evaluation of her right knee, and he recommended a course of physical therapy and a knee brace based on a diagnosis of right knee pain secondary to contusion with aggravation of chronic patellar subluxation and chondromalacia patella. He further restricted her from squatting, repetitive stair climbing and prolonged walking. (Tr. at 531-32.)[7]

In a March 28, 2008 RFC questionnaire, Dr. Dawson listed plaintiff's diagnoses as chronic pain, fibromyalgia and irritable bowel syndrome, with a poor prognosis. He listed her symptoms as chronic pain, knee instability and arm numbness. He indicated that her impairments lasted or could be expected to last at least twelve months, and that emotional factors contributed to the severity of her limitations. (Tr. at 396.) Regarding her functional limitations, Dr. Dawson wrote that plaintiff could walk ½ block, sit or stand twenty minutes at one time, and sit and stand/walk a total of two hours (each) in an eight hour workday. He further indicated that she needed to be able to shift positions from seated to standing or walking at will and required unscheduled breaks every hour for twenty minutes. (Tr. at 397.)

---

[7]In a March 12, 2008 letter to plaintiff's attorney, psychologist Don Rosenberg indicated that he provided plaintiff with family therapy, and that plaintiff had no psychiatric diagnosis per se. (Tr. at 395.)

13

With prolonged sitting, she needed to elevate her legs.  He opined that she could rarely lift less than ten pounds, occasionally twist, rarely stoop or climb stairs, and never crouch or climb ladders.  He listed significant manipulative limitations with both arms, limiting her to 25% of an eight hour day for grasping, fine manipulations, reaching in front and reaching overhead with the right arm, and 10% of the day with the left arm (but never reaching overhead with the left). (Tr. at 398.)  Finally, he indicated that her symptoms would frequently interfere with attention and concentration, and that she would be absent more than four days per month based on her impairments.  (Tr. at 399.)

### 2.    SSA State Agency Consultants

On May 11, 2005, Anthony Matkom, PhD., completed a psychiatric review technique form ("PRTF") for the SSA, finding that plaintiff suffered from no severe mental impairment. (Tr. at 256-69.)  On May 14, 2005, Dr. Robert Callear completed a physical RFC report, finding plaintiff capable of light work with no non-exertional limitations.  (Tr. at 270-77.)  On November 8, 2005, Dr. Pat Chan reviewed and affirmed Dr. Callear's RFC assessment (Tr. at 386), and William Merrick, PhD., reviewed and affirmed Dr. Matkom's PRTF (Tr. at 387).

## B.    Hearing Testimony

Plaintiff testified that she was forty-five years old, 5'4" tall and 184 pounds.  (Tr. at 551.) She indicated that she graduated high school and completed two years at Gateway Technical College in the hospital clerk program (Tr. at 551-52), and described past work as a health clerk, billing clerk, pharmacy technician, deli clerk and cashier (Tr. at 552-56).

Plaintiff testified that she last worked in December 2004 and attributed her inability to work thereafter to back and neck pain, nerve damage in her left (dominant) arm, irritable bowel

syndrome, fibromyalgia, knee problems and dizziness. (Tr. at 555-57.) She also described heart problems, for which she took Alprazolam. (Tr. at 558.) She stated that she experienced heart palpitations every day, between one and four times per day, lasting fifteen to twenty minutes, which required her to lay down, elevate her feet and take medication. (Tr. at 559-60.) She indicated that she experienced back and neck pain all the time, for which she took Vicodin every four to six hours. (Tr. at 565.) She testified that she also experienced pain related to the hernia because "the stitches ripped." (Tr. at 567.) Finally, she indicated that she experienced daily episodes of light-headedness and dizziness, lasting from minutes to hours (Tr. at 567-68), and that her medications interfered with concentration (Tr. at 575).

Regarding her daily activities, plaintiff testified that she avoided heavy lifting and limited her driving. She indicated that her children, ages thirteen, eleven and ten, helped with the shopping, laundry and cleaning. (Tr. at 571-72.) She stated that if she stood for more than fifteen or twenty minutes doing dishes she got light-headed and dizzy. (Tr. at 572.) She described bad days, in which it took her forty-five minutes to get out of bed due to pain, or where her IBS had her in the bathroom six to eight times per day. (Tr. at 573.) She indicated that if she tried to perform a full-time job, she would probably have to call in sick about half the time. (Tr. at 575.) Plaintiff stated that she had performed twelve hours of volunteer work per month but had been excused from that due to her knee problem. (Tr. at 575.) She stated that she volunteered about four days per month but had to re-schedule two of them due to her problems. (Tr. at 576.) She indicated that she tried Neurontin, Celebrex and Lyrica related to her fibromyalgia, but they all caused her to swell up. (Tr. at 587.)

## C.    ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since March

15

1, 2005, the date of her application, and that she suffered from severe impairments – cervical disc protrusion; back, neck, shoulder, knee and ankle pain, aggravated by obesity; heart palpitations; and fibromyalgia – none of which met or equaled listed impairment. (Tr. at 26.) The ALJ then determined that plaintiff retained the RFC for a full range of sedentary work. The ALJ believed that, given this RFC, plaintiff probably could perform her past clerical/office work, but he questioned whether those jobs constituted substantial gainful activity. He therefore proceeded to step five, denying the application under Grid Rule 201.21. (Tr. at 26-27.)

## IV. DISCUSSION

### A.    Applicable Legal Standards

Plaintiff argues that the ALJ erred in evaluating RFC and the credibility of her testimony, and in relying on the Grid at step five. As indicated earlier, if a social security claimant has severe impairments that do not meet or equal a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC") for work. RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant. Exertional capacity refers to the claimant's ability in the strength related areas of sitting, standing, walking, lifting, carrying, pushing and pulling. Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision)

16

activities. SSR 96-8p.

The ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. The ALJ must explain how he resolved any material inconsistencies or ambiguities in the evidence. SSR 96-8p. The ALJ is also required in setting RFC to consider all limitations that arise from medically determinable impairments, even those that are not severe, and he may not dismiss a line of evidence contrary to the ruling. Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009); see also Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005) (stating that the ALJ must consider the claimant's impairments in combination, evaluating the incremental effect of each on her ability to function). Nor may the ALJ "play doctor" and make his own independent medical findings. See Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). Rather, he must consider and address the medical opinions in the record, and if his RFC assessment conflicts with an opinion from a medical source, he must explain why he rejected the opinion. SSR 96-8p.

Medical opinions from a treating physician (a/k/a "treating source") about the nature and severity of the claimant's impairments are entitled to "special significance" and will, if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, be given "controlling weight." SSR 96-8p; Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). Even if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he may not simply reject it. SSR 96-2p. Rather, he must evaluate the opinion's weight by considering various factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's

17

consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Regardless of the weight the ALJ elects to give the treating source opinion, he must always "give good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2).

Finally, because in some cases pain alone can be disabling, even when its existence is unsupported by objective evidence, Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004), the ALJ is also required to consider the claimant's testimony and statements about her symptoms in evaluating her ability to work. SSR 96-7p sets forth a two step process for conducting this evaluation. First, the ALJ must consider whether the claimant suffers from some medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms. If she does not, the symptoms cannot be found to affect her ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit her ability to work. In making this determination, the ALJ may not discount "subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009). Rather, the ALJ must assess the entire case record, considering in addition to the medical evidence the claimant's daily activities; the duration, frequency and intensity of the symptoms; precipitating and aggravating factors; treatment modalities; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must provide specific reasons for his credibility determination, grounded in the evidence and articulated in the decision. See Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003). Such reasons may not be implied or supplied

18

later by the Commissioner's lawyers.  <u>Golembiewski v. Barnhart</u>, 322 F.3d 912, 916 (7th Cir. 2003).

## B.    Analysis

In determining RFC in this case, the ALJ failed to properly consider plaintiff's testimony and the report of treating source Dr. Dawson.  First, despite noting that the case "essentially comes down to the issue of pain and credibility" (Tr. at 24), the ALJ failed to make an explicit credibility finding.  Merely summarizing the testimony, as the ALJ did (Tr. at 24), is insufficient. <u>See, e.g.</u>, <u>Eggerson v. Astrue</u>, 581 F. Supp. 2d 961, 967 (N.D. Ill. 2008) (finding insufficient a summary of the testimony with little reasoning).[8]  I cannot substitute for an explicit credibility finding the ALJ's earlier statement that "a number of plaintiff's complaints and alleged medical conditions are either not supported by the medical evidence or are nowhere near as painful or incapacitating as plaintiff claimed."  (Tr. at 24.)  The ALJ failed to specify which conditions were unsupported by the evidence and which plaintiff supposedly blew out of proportion.  As noted,

---

[8]The Commissioner notes that the court must afford the ALJ's credibility determination special deference.  <u>See, e.g.</u>, <u>Eichstadt v. Astrue</u>, 534 F.3d 663, 667-68 (7th Cir. 2008).  But that is so only if the ALJ actually makes an explicit credibility finding. <u>See</u> <u>Schroeter v. Sullivan</u>, 977 F.2d 391, 394-95 (7th Cir. 1992) ("[W]hile we must defer to an ALJ's credibility assessment of a witness (unless it is patently wrong), we must first be certain that a credibility determination has actually been made.") (internal citation omitted); <u>see also</u> <u>Schwabe v. Barnhart</u>, 338 F. Supp. 2d 941, 955-56 (E.D. Wis. 2004) (reversing where the ALJ failed to link his discussion of the testimony and the evidence to his determination that the plaintiff's testimony failed to support her claim of disability); <u>Barnes ex rel. Barnes v. Massanari</u>, 171 F. Supp. 2d 780, 788 (N.D. Ill. 2001) ("In the subject circumstance, the ALJ needed to make an explicit credibility finding, and this court cannot presume that the ALJ disbelieved all of the claimant's testimony unless the ALJ explicitly states this.").  The Commissioner attempts to cull reasons for the ALJ's (implied) finding from the body of his decision and provides some reasons of own (e.g., that plaintiff's daily activities belie her claims of disabling pain), but this is forbidden. <u>Golembiewski</u>, 322 F.3d at 916. In any event, the ability to care for children and perform household chores, with assistance and frequent breaks, is not inconsistent with disability. <u>See</u> <u>Gentle v. Barnhart</u>, 430 F.3d 865, 867-68 (7th Cir. 2005).

19

SSR 96-7p requires the ALJ to first identify which conditions could reasonably be expected to produce the symptoms alleged, and to then make a credibility determination related thereto based on the entire case record, not just the medical evidence.[9] The ALJ must provide specific reasons for the credibility finding; it is insufficient to simply make a bald statement that the conditions are not as disabling as alleged. See, e.g., Lopez, 336 F.3d at 539-40.

I cannot find the ALJ's violation of SSR 96-7p harmless. Plaintiff's testimony, if believed, would preclude even sedentary work. To provide but a few examples, plaintiff testified that she had to lay down and elevate her feet several times per day, contrary to the ALJ's statement that "according to [plaintiff] most of her day is presumably seated." (Tr. at 24.) Plaintiff also alleged that she became light-headed and dizzy, and that her pills interfered with attention and concentration, conditions that might prevent any type of work. Finally, she referred to bad days in which she found it hard to get out of bed and claimed that, as happened with her part-time volunteer work, she would probably end up calling in sick half the time on a full-time job.

Second, the ALJ's reasons for affording Dr. Dawson's March 28, 2008 treating source report – which limited plaintiff to less than sedentary work – "little weight" cannot withstand scrutiny. The ALJ stated that the report was "inconsistent with the objective medical evidence" and in "stark contrast [to] his own contemporaneous progress notes." (Tr. at 25.) Regarding the latter statement, aside from quoting a May 19, 2005 note, in which Dr. Dawson stated that plaintiff's "radicular pain has resolved" (Tr. at 379; 25), the ALJ failed specify how the notes

---

[9]The fact that the ALJ found severe plaintiff's back, neck, shoulder, knee and ankle pain, heart palpitations, and fibromyalgia suggests that he believed these conditions could produce the symptoms alleged. He was therefore required to evaluate the severity of those symptoms based on the entire record and all the SSR 96-7p factors.

20

contradicted the report.[10]  Subsequent notes show that the pain and radicular symptoms had

<u>not</u> gone away (Tr. at 375 – September 13, 2005 note detailing continued neck pain and pain

radiating down the left arm; 459 – January 5, 2006 note discussing left arm and neck pain,

secondary to cervical radiculopathy), which the ALJ ignored.  Further, contemporaneous notes

from various providers record severe restrictions, not inconsistent with those contained in Dr.

Dawson's March 2008 report  (Tr. at 529 – August 22, 2005 note from Dr. Koch limiting plaintiff

from "most physical exertion"; 526 – November 1, 2005 letter from Dr. Koch imposing a lifting

limitation of 5-10 pounds; 518-19 – February 15, 2006 report from Dr. Koch restricting plaintiff

to less than sedentary work; 436 – August 16, 2006 letter from Dr. Dawson excusing plaintiff

from work; 477 – August 29, 2006 note from Drs. McCormick and Grindel noting plaintiff's

"current restrictions" of no lifting greater than 5 pounds and no "sitting or standing for long

periods of time"; 403 – January 22,  2008 note from Dr. Dawson stating that plaintiff was

disabled because of chronic pain; 400 – January 31, 2008 letter from Dr. Dawson excusing

plaintiff from part-time volunteer work due to her knee).  The ALJ failed to consider this

evidence in evaluating Dr. Dawson's report.[11]

---

[10]In his brief, the Commissioner attempts to bolster the ALJ's decision by citing certain treatment notes believed to be inconsistent with the report.  But it is the ALJ, not the Commissioner's lawyers, who must build an accurate and logical bridge from the evidence to the conclusion.  <u>Steele</u>, 290 F.3d at 941.

[11]It is true that Dr. Koch is a chiropractor, not an "acceptable medical source" under SSA regulations.  <u>See</u> 20 C.F.R. § 404.1513(d)(1) (listing chiropractors as other medical sources).  But the ALJ is not free to ignore evidence from such sources in determining the severity of a claimant's impairments.  <u>See</u> <u>Barrett v. Barnhart</u>, 355 F.3d 1065, 1067-68 (7th Cir. 2004).  The Commissioner argues that Dr. Koch's report is contrary to the opinions of the state agency consultants, but the ALJ did not rely on the consultants' reports in order to discount Dr. Koch's opinion; he simply ignored it.  The Commissioner's lawyers cannot fill in such gaps in the ALJ's decision.

21

Similarly, the "objective medical evidence" the ALJ relied upon fails to support rejection of Dr. Dawson's report. He compared Dr. Dawson's opinion to that of the orthopedist, Dr. Schultz, who found no knee instability; the neurological exams, which found intact muscle strength, sensation and reflexes; and the EMG, which revealed "mild" abnormalities. (Tr. at 25.) But Dr. Schultz limited plaintiff from squatting, repetitive stair climbing, or prolonged walking (Tr. at 532), restrictions consistent with those imposed by Dr. Dawson (Tr. at 398).[12] The ALJ acknowledged Dr. Schultz's restrictions earlier in his decision, but opined that Dr. Schultz "was probably being generous with [plaintiff] and giving her considerable benefit of the doubt." (Tr. at 24) The ALJ failed to explain the basis for this assertion, and his claim that Dr. Schultz treated plaintiff for a knee contusion and only "speculat[ed] as to some degree of chondromalacia" (Tr. at 24) is wholly unsupported by the record. The finding of chondromalacia, also noted by Dr. Dawson, was based on an MRI (Tr. at 401; 531), not speculation. Dr. Schultz, on review of the MRI, wrote that "there is evidence of marked lateral subluxation of the patella in addition to chondromalacia of the patellofemoral joint." (Tr. at 531.) A lay ALJ may not simply reject medical evidence in this manner.

The ALJ failed to specify the neurological exams upon which he relied; as noted above, Dr. Dawson's notes document limited strength in the left arm and diminished grip strength in the left hand (Tr. at 382); likewise, Dr. White noted numbness in the left hand and left arm weakness (Tr. at 393). It is true that the March 2005 EMG revealed "mild acute and chronic

---

[12]The Commissioner claims that Dr. Dawson's report was more restrictive, as he opined that plaintiff should "never" squat, while Dr. Schultz limited plaintiff only from "prolonged" squatting. The Commissioner misreads Dr. Schultz's note, which states: "I filled out a form stating that she could not do squatting, repetitive stair climbing, or prolonged walking." (Tr. at 532.) The two reports are, regarding the areas of mutual discussion, consistent.

22

left C7, 8 radiculopathy" (Tr. at 178), but even if plaintiff's chronic pain and resulting limitations could not be _fully_ explained by such objective medical testing did not mean that those symptoms and limitations did not exist.[13]  The ALJ wrote that Dr. Dawson's more recent notes point to "definite functional overlay tendencies on [plaintiff's] part."  (Tr. at 25.)  The fact that plaintiff's anxiety may have been exacerbating her physical symptoms, as Dr. Dawson stated in the note the ALJ relied upon (Tr. at 414), did not mean that she was faking or that Dr. Dawson was overreaching in his report.  "Pain is always subjective in the sense of being experienced in the brain.  The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels."  Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004).  The ALJ failed to appreciate the difference.

Finally, the ALJ's consideration of plaintiff's fibromyalgia reflects a misunderstanding of the disease.  The ALJ first questioned the diagnosis, stating that it "underscores the general lack of 'hard' objective findings, only multiple tender points."  (Tr. at 25.)  But tender points _are_ "objective" evidence of fibromyalgia.  As the Seventh Circuit has explained:

---

[13]The ALJ also wrote that "question was raised as to a possible disk herniation, [but] that has since been rejected," and that a neurosurgeon at the Medical College ruled out the need for surgery.  (Tr. at 25.)  It is true that one of the surgeons plaintiff consulted, Dr. Kurpad, advised against surgery at that time, but the other, Dr. White, recommended a discectomy and fusion, and MRIs of plaintiff's cervical spine consistently showed disc problems at C6-7, alternately labeled a "protrusion" (Tr. at 193; 306), "herniation" (Tr. at 394), or "bulge" (Tr. at 390).  Later MRIs of the lumbar spine also revealed disc problems.  (Tr. at 540.)  Regarding plaintiff's left arm complaints, the ALJ wrote that "there is no evidence in the record of any injury or residual impairment to the left arm."  (Tr. at 25.)  But, as indicated above, several physicians, including Dr. Dawson and Dr. White, diagnosed disc herniation/protrusion with radicular symptoms, confirmed on MRIs and EMG testing.  The treatment records from Dr. Dawson, Dr. White and Dr. Koch document chronic neck, arm and shoulder pain, and left arm weakness.  (Tr. at 190; 375; 378; 382; 393-94; 441; 519.)

23

> [The] cause or causes [of fibromyalgia] are unknown, there is no cure, and, of
> greatest importance to disability law, its symptoms are entirely subjective. There
> are no laboratory tests for the presence or severity of fibromyalgia. The principal
> symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only
> symptom that discriminates between it and other diseases of a rheumatic
> character – multiple tender spots, more precisely 18 fixed locations on the body
> (and the rule of thumb is that the patient must have at least 11 of them to be
> diagnosed as having fibromyalgia) that when pressed firmly cause the patient to
> flinch.

Sarchet, 78 F.3d at 306. Thus, if the ALJ was looking for other "hard evidence" of this condition, none would be found. See Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100-01 (E.D. Wis. 2001) (citing Sarchet, 78 F.3d at 307). The ALJ continued that if plaintiff "does indeed suffer from fibromyalgia, a diagnosis which has only recently been raised based in large part on subjective complaints of tenderness, the undersigned believes that it would not prevent [her] from performing at least sedentary work." (Tr. at 25.) Dr. Rosler diagnosed plaintiff with fibromyalgia, finding fifteen of eighteen tender spots. (Tr. at 537.) In the absence of contrary evidence, it was improper for the lay ALJ to reject a diagnosis of fibromyalgia by a medical doctor, or to assume that the diagnosis had been made just because the doctors did not know how else to label plaintiff's complaints. See Alexander v. Barnhart, 287 F. Supp. 2d 944, 963-65 (E.D. Wis. 2003). As the Seventh Circuit has acknowledged, fibromyalgia is generally not disabling, Sarchet, 78 F.3d at 307, and it may well be that plaintiff's condition does not preclude sedentary work. But she is entitled to re-evaluation under appropriate standards.[14]

_____

[14]The Commissioner notes that at one point Dr. Dawson stated that plaintiff's symptoms did "not fit fibromyalgia very well." (Tr. at 414.) However, he later accepted the diagnosis (Tr. at 406) and, in any event, the ALJ did not rely on this note in questioning the diagnosis. See Steele, 290 F.3d at 941 ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the

24

In sum, "the ALJ simply marginalized [Dr. Dawson's] opinions without a sound explanation and then went on to conclude that neither [plaintiff's] own testimony nor the remaining medical evidence supported her subjective complaints of pain." Moss, 555 F.3d at 561. On remand, the ALJ must re-evaluate the medical evidence from all sources, the combined effects of plaintiff's impairments, the credibility of the testimony under SSR 96-7p, and the treating source report under 96-2p.[15]

Plaintiff argues that the ALJ should have consulted a VE at step five; specifically, she contends that her significant (non-exertional) postural and manipulative limitations made reliance on the Grid improper. The ALJ disagreed, finding plaintiff capable of a full range of sedentary work. On remand, the ALJ must, after re-considering RFC, determine whether the testimony of a VE is required.

## V. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter

---

ALJ."). The Commissioner argues that it was reasonable for the ALJ to question the diagnosis, but he fails to persuasively explain why. So far as the record shows, Dr. Rosler employed the appropriate diagnostic technique in making his finding; the fact that he saw plaintiff just a few times cannot, standing alone, permit rejection of his diagnosis. The Commissioner's claim that no other doctor supported the diagnosis is incorrect; Dr. Dawson listed the condition in his notes as well. (Tr. at 404; 406.)

[15]Plaintiff argues that the ALJ failed to consider the effect of her obesity, but the ALJ did factor that condition into his RFC analysis in limiting plaintiff to sedentary rather than light work (as the state agency consultants found). (Tr. at 24.) Likewise, I cannot conclude that the ALJ erred in failing to incorporate the psychological consultants' "mild" limitations in the RFC. As the Commissioner notes, such ratings generally indicate that the impairment is not severe, i.e. it does not substantially affect the ability to work. See 20 C.F.R. § 404.1520a(d)(1). Nevertheless, plaintiff may on remand seek to persuade the ALJ to factor mental limitations, even if not severe, into the RFC.

25

judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of June, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge